MICAJAH J. MULVERHILL *v.* VICKSBURG RAILWAY, POWER & MANUFACTURING COMPANY ET AL.

[40 South. Rep., 647.]

1. CORPORATIONS. *Promoters. Contracts. Construction. Railroads.*

Where complainant, owning a franchise for the construction and operation of a street railway, contracted with a third party to transfer the same to a corporation in consideration of his agreeing to build the railroad, paying complainant twenty-five per centum of any profit that might be made out of the property, and the road was constructed as agreed, but no profits were made therefrom, the interest of the complainant in the road is to be determined by treating the amount advanced for its construction and equipment as a first lien thereon, and not as a payment on capital stock.

2. SAME.  *Liability of corporation.*

Where at the time a street railway franchise was assigned it was
understood that the assignee acquired the same for the benefit
of a corporation which was to own and operate the road, and the
corporation afterwards accepted the benefits accruing to it from
the contract and availed itself of the franchise, with full knowl-
edge of the manner and conditions upon which it was obtained,
a contract by the promoters to make designated payments to the
assignor, in consideration for his services in obtaining the fran-
chise and assigning it, is binding on the corporation.

3. SAME.  *Disposition of assets.  Right of stockholder to object.*

In a suit by one of the promoters of a corporation to enjoin an
alleged fraudulent sale of all of the corporation's assets, indi-
vidual corporators cannot object that complainant has no status
in court because no stock had ever been issued to him, when the
entire corporate scheme was projected without any attempt to
comply with the law providing that stock should not be issued in
any corporation except for money, labor done or property actually
received.

4. SAME.  *Promoter's contract.  Construction.*

Where the incorporators of a street railway company agreed, in
consideration of the assignment of a franchise procured by plain-
tiff to one of them for the benefit of the company, to pay plaintiff
one-fourth of the stock and bonds of the corporation over and
above the cost of construction, plaintiff's right was not to receive
a definite number of shares of stock, but the equitable ownership
of one-fourth of the whole railroad when completed and equipped,
together with its franchise, subject to a prior lien in favor of the
incorporators advancing the money to complete and equip the
road to the extent of the money so advanced.

5. SAME.  *Street railway.  Sale of franchise and assets.  Insolvency.*

The sale of a corporation's franchise and all of its assets, although
the company be insolvent, made for the purpose of eliminating
the interest of a particular stockholder, is fraudulent and void as
to him if authorized only at a secret meeting of the other stock-
holders of which he purposely was not given notice.

6. SAME.  *Insolevncy.*

Where a contract for the construction of a street railroad contem-
plated that the moneys advanced to complete and equip the rail-
road should be treated as a bonded and not as a current debt
presently payable, the current revenues derived from the opera-

tion of the road could not be diverted from the payment of operating expenses, fixed charges, and current expenses, and applied to such construction debt for the purpose of showing that the road was insolvent

7. SAME. *Judgment.   Assignment.*

Where an assignment of certain judgments against a street railway company, the property of which had been purchased by an individual under a fraudulent sale, was brought about by him in order that he might buy the assets of the railroad company at an execution sale and strengthen his title, neither he nor a new corporation formed to take over and operate the road could avail themselves of any rights acquired under such judgments against the original corporation.

8. SAME. *Equitable relief.   Prayer.*

Where defendants, including a new corporation organized to take over the assets of a street railway, participated in a sale thereof which was fraudulent as against complainant, but prior to the institution of a suit to set aside the same, the fraudulent purchaser and the new corporation paid debts and judgments existing against the old corporation, and a vacation of the sale and the appointment of a receiver would probably seriously affect the public interest, a personal decree should be rendered instead, under the prayer for general relief, against both the old and the new corporations and the individual defendants for the amount of plaintiff's interest, of which he was so deprived.

FROM the chancery court of Warren county.

HON. WILLIAM P. S. VENTRESS, Chancellor. .

Mulverhill, the appellant, was complainant in the court below; the railway, etc., company and others, the appellees, were defendants there.   From a decree in defendants' favor the complainant appealed to the supreme court.

Complainant claimed to be a stockholder in the Vicksburg Railway, Power & Manufacturing Company, being a quasi pub-poration, and by his bill of complaint sought to cancel a sale of the plant, property, and franchise of said company made to the Vicksburg Railway & Light Company.   The bill also prayed that certain conveyances, deeds of trust, and mortgages executed by the officers of the company and purporting to be liens upon

the property of the Vicksburg Railway, Power & Manufacturing Company be cancelled, and that certain bonds mentioned in these conveyances, and sought to be secured by them, be cancelled as invalid and without consideration, and that the interest collected on these bonds should be paid back by the holders of the same, who are alleged to be holders without consideration and to have wrongfully appropriated the interest on said bonds to their own use.    The appellant further contended that the Vicksburg Railway, Power & Manufacturing Company, being a quasi public corporation, could not lease or alienate its property or franchise, and that any attempt at leasing or alienation was *ultra vires*, and a dissenting stockholder had the right by injunction to prevent such alienation, and if already alienated, to have the same set aside; that Mulverhill, being a stockholder, was entitled to have the sale set aside and vacated, and have a receiver appointed to take charge of the property.

Complainant also attacked the validity of an execution sale made to satisfy certain judgments against the Vicksburg Railway, Power & Manufacturing Company.    A motion for the appointment of a receiver, made before the chancellor in vacation, was overruled.    The case was afterwards heard in term time, and a decree rendered dismissing the bill and denying any and all relief.    All the stock of the Vicksburg Railway, Power & Manufacturing Company, except that which was issued in payment for an electric light plant, was issued in blank by Mulverhill, who was its secretary, and delivered to Shaffer, to be used by him in financiering the enterprise.    The proceeds of the sale of the bonds were to be used in the improvement and extension of the road.    However, the bonds were not sold, and Shaffer and his associates held both the stock and bonds, except a portion thereof paid for the electric light plant, as stated in the opinion. The record discloses the fact that the Vicksburg Railway, Power & Manufacturing Company contracted to sell its property and franchise to one Harry K. Johnson, who was in turn to convey

to the Vicksburg Railway & Light Company, a new corporation to be organized for the purpose of taking over the assets of the old company.    This sale to Johnson was authorized and made at a meeting at which Mulverhill was not present and to which he was not invited, the other parties claiming that he was not a stockholder and had no right to be present.· ·Certain judgments against the company had been bought by Johnson, and he, having caused the entire railroad properties to be advertised and sold at public outcry to satisfy the judgments, was the highest bidder for $37,000.    The sheriff demanded immediate payment of the bid, and refused to credit it on the judgments or wait until the cash could be procured.    The executions were thereupon withdrawn.

The contention of the appellee was that appellant was not a stockholder and has no rights in the premises; that he was to receive for his services in securing the franchise a portion of the profits; that there were no profits, but, on the other hand, the company was insolvent, and therefore the appellant's interest amounted to nothing.

*McLaurin, Armistead & Brien,* and *Williamson & Wells,* for appellant.

We think the case is resolvable and can be determined by the consideration of four principles, to wit:

(1) That a quasi public corporation, such as a street car company, performing public duties, cannot lease or alienate its property and franchises either at common law or under the statutes of Mississippi. ·

(2) That any attempted lease or alienation of such corporation property and franchises is *ultra vires* and illegal, and any single dissenting stockholder can complain, either by injunction to prevent such acts, or if already performed, may in equity have them set aside.

(3) Is Mulverhill a stockholder?

(4) The foregoing proposition being granted, is the complainant in the case entitled to a receiver?

As shown by the evidence in this case, the Vicksburg Railroad, Power & Manufacturing Company was chartered under the general statutes of Mississippi in 1898, and the Vicksburg Railway & Light Company was chartered under said statute in 1903.

It has been held in the cases of *Woodberry* v. *McClurg*, 78 Miss., 831 (s.c., 29 South. Rep., 514), and *Adams* v. *Tombigbee Mills,* 78 Miss., 389 (s.c., 29 South. Rep., 470.), that where franchises and corporate powers are granted under a statute they must square with the act, and the corporation can exercise only such powers as are prescribed in the statute. The court, on an examination of chapter 25 of the code of 1892, and sec. 836, in reference to corporations and their powers, will find that nowhere in said act is there contained any power or privilege granted to any corporation to purchase from another or sell its corporate powers and franchises. The power to mortgage does not include the power to sell, but the power to sell includes the power to mortgage. The power to mortgage is in aid of the performance of its duties. See 7 Am. & Eng. Ency. Law (2d ed.), 752.

Section 845 of the code, in the chapter on corporations, authorizes the franchise and property of every kind of any corporation to be sold to satisfy a judgment, but there is no provision anywhere in this act authorizing a voluntary sale of any such franchise or property. Under the common law we could not levy an execution on the franchise of the corporation, because that law was, that you interrupted it in performing a public duty, and the only way this can be performed is by special statutory permission. Mississippi has that statutory permission only for the purpose of satisfying judgments against any such corporation. .

It was never contemplated by the code, nor is it authorized by the common law, that any such quasi public corporation can voluntarily effect its dissolution by a voluntary sale of all its prop-

erty and franchises, including its franchise to be a corporation, as was attempted in this case. This principle is sustained by a multitude of authorities. Cook on Stockholders (2d ed.), sec. 668; 4 Thompson on Corporations, sec. 4520; *Thompson v. Railroad Co.,* 101 U. S., 71; 139 U. S., 24, *et seq.;* 35 Am. St. Rep., 395, and exhaustive footnote; 7 Am. & Eng. Ency. Law, 747 to 752, inclusive, and notes 2 and 5 on p. 748; 4 Thompson on Corporations, secs. 5373 and 5374 and note 3; *Woodberry v. McClurg,* 78 Miss., 831 (s.c., 29 South. Rep., 514); Laws 1900, 127, sec. 5 of the anti-trust act.

It is a principle of the common law recognized by all the law writers on corporations that a mortgage, purchase or lease of one corporation by another must be within the corporate powers of both. 139 U. S., 24. If one had a right to sell and another had no right to purchase and the other had no right to sell, it would be equally illegal. A single dissenting stockholder can object to the mortgage, sale, lease, or alienation by a corporation of its property and franchises.

Those acts of which only the state can complain are set forth in *Fargason v. Mercantile Co.,* 78 Miss., 66 (s.c., 27 South. Rep., 877), and the state alone can claim a forfeiture of the charter, none of which questions are involved in this case.

Mulverhill is the equitable owner of his stock, which had been placed in Shaffer's hands, but was never used by Shaffer for the purpose designated, and therefore Mulverhill's standing as a stockholder remains the same as if he had never issued a stock certificate to a soul on earth, and the same as if he had his stock certificate now himself. 2 Clark & Marshall on Corporations, 1698, lays down the rule that an equitable stockholder has the right in equity to sue as a stockholder and will be protected as well as if he had a legal right. *Fisher v. Patton,* 134 Mo., 32.

Again, stock standing on the books of the company in another's name will not prevent the real owner from showing his ownership unless he had done something whereby he is estopped.

*N. Y. Commercial Co.* v. *Francis,* 83 Fed. Rep., 769; Cook on Stock and Stockholders (2d ed.), sec. 729; Cook on Stockholders (2d ed.), sec. 52; *Butler University* v. *Scoonover,* 5 Am. St. Rep., 628; 1 Morawetz on Corporations, sec. 74; *Palmetto Lodge* v. *Hubbell,* 49 Am. Dec., 604.

The test of whether or not one is a stockholder in a corporation is this: If he would be estopped to deny he was a stockholder if he sued as such, then he is a stockholder in law for all purposes. Estoppels are mutual. Morawetz on Corporations, sec. 741; *Semple* v. *Glenn,* 24 Am. St. Rep., 894; *In re Argus Printing Co.,* 26 Am. St. Rep., 658; *Holland* v. *Duluth Iron, etc., Co.,* 60 Am. St. Rep., 480, and note at page 487.

Again, when the owners of shares are entered in the corporation records, all parties become thereby *prima facie* entitled to the rights thus secured to them, and the records are competent and sufficient evidence of them unless proof be introduced to destroy their effect. 2 Thompson on Corporations, sec. 1918; *Turnbull* v. *Payson,* 95 U. S., 418; *Lehman* v. *Glenn,* 6 South. Rep., 45; *Glenn* v. *Orr,* 96 N. C., 413; *Sayrr* v. *Glenn,* 6 South. Rep., 45; *Slratton* v. *Lyons,* 53 Vt., 130.

When one has been permitted by the company to exercise the privileges and receive the benefits of membership, or has allowed himself to be treated as a member of the corporation, neither he nor the company will be heard to deny the existence of the relation. 1 Beach on Private Corporations, sec. 67; *Union Savings Ass'n* v. *Seligman,* 92 Mo., 635 (s.c., 1 Am. St. Rep., 776).

Acts and proceedings at a secret meeting which bear the appearance of "trick, secrecy or fraud are invalid." 2 Beach on Corporations, sec. 297; *Holden* v. *Hoyt,* 134 Mass., 181.

Some authorities have been cited by counsel on the point that if Mr. Mulverhill was only an equitable stockholder, that he had no standing to maintain the suit, and federal authorities are relied on. The court will notice in 2 Clark & Marshall on Corporations, p. 1699, sec. 551, that suits by stockholders in federal

courts have no application to state courts, and are "no authority whatever as applied to suits in state courts," the federal courts being governed by Equity Rule 94 of the supreme court of the United States.

*Smith, Hirsh & Landau,* for appellees.

The contention of appellees was that the appellant was not a stockholder in the Vicksburg Railway, Power & Manufacturing Company, and was not entitled to be present at any of the meetings of the stockholders or directors of said company; that his only interest was in the net profits which this company might make, and that such interest did not entitle him to representation at such meetings of said corporation.

It was further contended that, inasmuch as the Vicksburg Railway, Power & Manufacturing Company had not made any profits, but on the other hand had sustained heavy losses, and was insolvent, and Mulverhill could have no interest whatever in either the management of the corporation, the sale of its property, or otherwise.

To constitute stockholder, some sort of subscription or contract is required, whereby the subscriber obtains the right, upon some condition, to demand stock and to exercise the rights of a stockholder. *Butler University* v. *Scoonover,* 114 Ind., 381 (5 Am. St. Rep., 627).

Where no stock has ever been issued to any party claiming such stock, he is not the owner thereof until he has enforced his rights to the same by proper proceeding. His mere claim of the ownership does not make him an owner.

If a person asserts a right to the corporate stock by virtue of a contract with an owner of any stock, the contract is with that owner, and not with the corporation, and he must look to the party with whom he had contracted for relief.

When a party claims to be an owner of stock under a contract with another person, he must procure said stock from said person either by amicable agreement, or by proper proceedings, at

law or equity, before he can demand relief from a corporation which issued such stock.

"In order that a person may maintain a suit as a stockholder to set aside, or enjoin an *ultra vires* transaction, or to redress or prevent other injuries to the corporation, he must be a stockholder in fact when the suit is brought." 2 Clark & Marshall on Corporations, 1698.

"A court of chancery cannot decree specific performance of an agreement to convey property which has no existence, or to which defendant has no title." *Kennedy* v. *Hazelton,* 128 U. S., 667.

The books and records of a corporation, when properly authenticated, are admissible in evidence in proper cases, and, like all documents, are the best evidence of their contents as distinguished from secondary evidence, but they are only *prima facie* evidence and subject to contradiction and explanation by parol. 10 Cyc. of Law & Prac., 515, and authorities cited in brief.

"Act of voting does not make voters absolute stockholders, either as between themselves and the corporation, or creditors of the corporation." *Union Savings Ass'n* v. *Seligman,* 92 Mo., 635; 1 Am. State Rep., 776, and other authorities cited in brief.

A failure to enter resolution on the minutes does not affect its validity, "as most corporate acts can be proved by parol, as well as by written entries." *Handley* v. *Stutz,* 139 U. S., 417, and authorities cited in brief.

The constitution of Colorado provides that no corporation shall issue stock or bonds, except for labor done, services performed, or money or property actually received, and all fictitious increase of stock or indebtedness shall be void, practically the same as sec. 196 of the constitution of Mississippi.

Stock was issued, and bonds were issued, and some of the stockholders assailed the transaction. The supreme court of Colorado said: "Complainants are without equity. Even assuming the individual plaintiffs were shareholders to the extent of one share each, they participated with the defendant in all the

alleged illegal transactions, and for that reason alone they cannot be heard. The contract now sought to be avoided was negotiated by them with full knowledge that Haskell was to be the president of the company, and to exercise absolute control over its affairs. They were advised of every step taken under the contract, yet the records fail to show that they ever objected. All the expenditures made by the defendant were made with their knowledge and approval. The entire stock of the company was fraudulently and illegally issued, and converted by them and by the defendant. The issue of the bonds and the execution of the trust was authorized by them. They asked for an accounting, yet it does not appear that they, or either of them, have expended a dollar which would constitute a legitimate claim against the corporation, or against the defendant. They ask that the bonds and trust deed be declared void, yet by their own admissions their interest in the corporate property is merely nominal. Throughout the whole of this extraordinary record of fraud and violation of law in the administration of the affairs of the corporation, these parties appear first as promoters and at all times as active participants in every illegal action. Counsel for plaintiff in error states in his brief that the court below dismissed the bill because *ex turpi causa non orator actio.* The maxim was well and aptly applied." *Arkansas River Land, etc., Co.* v. *Farmers Loan & Trust Co. et al.,* Sup. Ct. Col., Dec. 24, 1899, 22 Pac. Rep., 954.

Appellant was, therefore, in any view, estopped from assailing the validity of these stocks and bond transactions.

"The doctrine is fundamental that either parties seeking a specific performance against the other, must show, as a condition precedent to his obtaining the remedy, that he has done or offered to do, or is then ready and willing to do, all the essential and material acts required of him by the agreement at the time of commencing the suit, and also that he is ready and willing to do all such acts as shall be required of him in the specific execution

of the contract according to its terms."    3 Pomeroy's Equity Jurisprudence, sec. 1407.

"Complainant cannot undertake to acquire an interest in property under an execution sale, and failing in his purpose, then attack the judgments upon which executions were issued as invalid."    Morawetz on Corporations, sec. 634.

Johnson having offered to comply with the conditions of his purchase at the execution sale on July 6, 1903, is entitled, as against complainant, to the property so purchased."

It has been held that at common law, that the franchises of even a steam railway is inalienable, without special or express consent of the legislature.    *Miller* v. *Rutland, etc., R. R. Co.,* 35 Vt., 452; *Bank of Middleburry* v. *Edgerton,* 30 Vt., 182.

The question of the power of a corporation to sell its franchise is a matter between the state and the corporation, with which third parties have nothing to do.    *Arthur* v. *Comm. & R. R. Bank of Vicksburg,* 9 Smed. & M., 394, 1430; 4 Thompson on Corporations, 4084.

Code 1892, ch. 25, § 336, expressly authorized a corporation to mortgage its property and hypothecate its franchise.

When appellant notified the representative of Mr. Johnson, when the offer of $1,000 was made, that he looked to Mr. Shaffer, he cannot now object to the sale to Mr. Johnson.

"A contract between two persons for mutual coöperation in securing a franchise for a street railway an equal division of what may be realized from the enterprise will not be enforced in equity, by decreeing that one of the persons who has been excluded by the other, from the benefit of the franchise which was granted to the latter by the city, with the knowledge of all the facts, shall have one-half interest in the franchise, property and stock of the corporation, to which the franchise was granted, but he will be left to his remedy at law."    *Hyer* v. *Richmond Traction Co. et al.,* 168 U. S., 471.

"A stockholder who participates as an officer, or as a stock-

holder, in illegal or *ultra vires* transactions, on the part of the directors or the stockholders, or consents thereto, or who, with full knowledge of the intention to engage in such transaction, acquiesces therein, instead of objecting and taking steps to prevent the same, is estopped to afterwards sue in equity to set the transaction aside, and it made no difference if he sued on behalf of himself, and other stockholders, and that there are other stockholder who might maintain a suit.    The same is true where a stockholder expressly, or by his conduct, subsequently ratifies the transaction."    Clark & Marshall on Corporations, 1705, and other authorities cited in brief.

"A shareholder who has participated, ratified or acquiesced in the acts of a corporation, is estopped as against it, while it remains bound by its acts from attaching the validity thereof, and this is true where a railroad company made a lease of its road, rolling stock and franchise to another railroad for twenty years, or longer, conceded to be *ultra vires* and void." *Memphis & Charleston R. R.* v. *Grayson,* 88 Ala., 572 (16 Am. Rep., 69).

"Stockholders cannot lay by and sanction by their assistance or at least acquiesce in an arrangement which is *ultra vires,* of the company to which they belong, and awaiting the result, if it be favorable and profitable to themselves to abide by it, and insist on its validity, but if it prove unfavorable, and disastrous, institute proceedings to set it aside." Morawetz on Corporations, sec. 631, and cases cited.

When an officer of a company signs the minutes of a company, authorizing bonds to be issued, attests every bond, attests the deeds of trust securing the bonds, contributes by act and deed to their negotiation and disposition, makes no objection, or protest, but so far as he can as such officer, approves and ratifies such issue of bonds, execution of instruments securing the same, and their negotiation, he is estopped from denying their validity. And in this case Mulverhill cannot question the validity of the issue of the two hundred thousand dollars first mortgage bonds,

one hundred thousand dollars second mortgage bonds, the execution of the deeds of trust securing the same, and the negotiation and disposition thereof.

If parties illegally issue stock and bonds, of a corporation, among themselves, some taking bonds and others taking stock, and others part bonds and part stock, a party to this transaction who takes only stock cannot keep the stock, and deprive the others of their bonds.

ALEXANDER, Special J., delivered the opinion of the court.*

We find no serious conflict in the evidence as to the terms of the contract made with Shaffer by Mulverhill and his associates. In consideration of the assignment to Shaffer of the franchise for the street railroad, he agreed to build the road and give to Mulverhill and associates one-fourth interest in the same over and above the cost of construction. It was contemplated by all parties concerned that the franchise should be transferred to the Vicksburg Railway, Power & Manufacturing Company, a corporation chartered to build and operate the railroad; that first mortgage bonds should be issued and sold to pay for the cost of construction and equipment, and that the interest of the promoters should be the value of the railroad properties and franchise over and above such cost. Shaffer himself states the terms of the agreement in the following words:

"I agreed with Mordaunt and Smith that if the franchise was turned over to the corporation—the Vicksburg Railway, Power & Manufacturing Company—without any financial obligations, that I would agree to build the railroad and pay to them and their associates twenty-five per cent of any profits that I might make out of the property, either in cash, bonds or stock."

And again, in a letter to Mulverhill, he wrote:

"The first mortgage bonds of $200,000 will be sold, and all that money will be put into the plant. Neither Mr. Hughes nor

*WHITFIELD, C, J., being akin to some of the parties in interest, recused himself, and C. H. ALEXANDER, Esq., a member of the Supreme Court bar, was appointed and presided in his place.

myself are to receive any profits out of the sale of these bonds; nor are we to make any profit out of the construction of the road."

Mr. Smith, who was one of the associates of Mulverhill, and who, with Mordaunt, personally negotiated the contract with Shaffer, testified as follows:

"We had this understanding: That a certain amount of first mortgage bonds were to be issued, then a certain amount of second mortgage bonds, and a certain amount of capital stock. It was thought by Shaffer that the proceeds of the first mortgage bonds would be sold for the construction of the road and for the electric light plant, possibly some of the second mortgage bonds being necessary, and that the profits from the enterprise would then be whatever was left of the second mortgage bonds and capital stock."

This is in substantial accord with the testimony of Mulverhill, and is corroborated by the correspondence which passed between the parties.

The capital stock of the corporation was fixed first at $250,000, and later was increased to $300,000. First mortgage bonds amounting to $200,000 and second mortgage bonds amounting to $100,000 were issued, but none of the stock or bonds were ever disposed of, except $100,000 of stock and $50,000 of first mortgage bonds, which were turned over to Shaffer and Hughes in purchase of the plant and franchises of the Vicksburg Electric Light Company. The theory of Mulverhill, set out in his bill of complaint and earnestly pressed in argument, is that the first mortgage bonds were issued for the purpose of the extension and betterment of the plant, and since they were never sold, all the money advanced by Shaffer and Hughes for the construction and equipment of the railroad, aggregating, it is said, $271,000, must in legal contemplation be treated as paid in on the capital stock; that both the first and second mortgage bonds were, therefore, fictitious and illegal, and complainant and his associate

became entitled under the contract to one-fourth interest in the railroad and its franchise, free from the lien of the trust deeds given to secure the bonds and without any prior right in favor of Shaffer and Hughes, growing out of their advances. We reject this view as unreasonable and at variance with the understanding of all the parties who shared in the promotion of the enterprise. While the services of Mulverhill and his friends in obtaining the franchise, and the franchise when obtained, were unquestionably of great value to Shaffer and to the corporation, it can hardly be supposed that any of the parties considered that the mere franchise, for which nothing was paid to the municipalities or the county, was the fair equivalent in value of one-fourth of the total cost of the completed street railroad. Mulverhill admits that the interest of himself and associates was to be one-fourth of the stock and bonds "over and above the cost of construction." It is quite evident that he contemplated that the cost of construction—that is, all moneys advanced to pay for the building and equipment of the road—whether paid by Shaffer or represented by the bonds, if sold, should be a prior charge upon the railroad and its franchise. This, we think, is the true purport of the contract.

But it is urged by appellees that, conceding the foregoing construction of the contract to be correct, it was a contract with Shaffer as an individual, and imposed no obligation upon the corporation. This position is untenable. It was well understood at the time that the franchise assigned to Shaffer was being acquired for the benefit of the corporation, which was to own and operate the street railroad. In anticipation of the acquisition of the franchise, the company had already been chartered. The very terms of the agreement in reference to the issuance of stock and bonds could have had reference only to a corporation. Besides all this, the corporation accepted the benefits accruing to it from the contract and availed of the franchise with full knowledge on the part of all parties concerned in its organization of

the manner and conditions on which it had been obtained.
Under such circumstances, it is well settled that the contract is
binding on the corporation.    1 Beach on Private Corporations,
sec. 198;    2 Clark & Marshall on Private Corporation, 306;
*Whitney* v. *Wyman,* 101 U. S., 392 (25 L. ed., 1050).

In the next place it is argued that, even if the contract be held
binding on the corporation, yet Mulverhill never became a stock-
holder, and therefore has no standing to question the disposition
ultimately made of the railroad and its franchises; that his con-
tract was merely to receive a share of profits, if there should be
any, and, as no profits were ever earned, complainant is not enti-
tled to any relief.    Counsel on both sides seem to have treated
the question whether Mulverhill became a stockholder as a deter-
mining one, and have brought to the discussion of it a wealth of
learning and research.    We cannot think the inquiry material
to the proper disposition of this controversy.    In the first place,
we do not think any of the individual defendants in this suit are
in a position to invoke any strict principles of law governing the
issuance and disposition of corporate stock and bonds.    They
were far too late in manifesting their concern for the technical
observance of the law in this respect.    The entire scheme was
projected and the corporation organized in utter disregard of
the prohibition contained in the constitution of this state against
the issuance of stock and bonds, except for money, labor done or
in good faith agreed to be done, or money or property actually
received.    No money was ever paid in on the capital stock, and,
aside from the value of the franchise procured for the corpora-
tion by Mulverhill and associates and the plant and franchise of
the Vicksburg Electric Light Company transferred to the corpo-
ration by Shaffer and Hughes, nothing of any value was ever
paid in for which stock could legally have been issued.    The
intelligent promoters of this enterprise could not have been
ignorant of this plain, palpable violation of law in reference to
the issuance of stock and bonds.    Indeed, the attorney who acted

throughout as the legal adviser of Shaffer and of the corporation candidly testifies that the expectation was that the first mortgage bonds would be issued to obtain money for building the railroad, and that the capital stock was increased to $300,000 to prevent the indebtedness being in excess of the capital stock.    It must be noted that this is not a case in which a corporation contracted to issue and deliver stock or bonds, or both, to an agreed amount to pay for the construction of a railroad, a transaction not unusual and which, if free from fraud, is unobjectionable.    The railroad was not built by Shaffer under any construction contract with the company, and the stock and bonds, except those issued to pay for the electric light plant, were never disposed of by any corporate act.    It necessarily follows that, so far as complainant seeks to establish his right to a definite number of shares of the stock so issued, the bill cannot be maintained.    There was never any valuation placed upon the franchise assigned to the corporation, nor upon the services rendered by Mulverhill and his associates, and none of them subscribed for any definite number of shares of stock, to be paid for by assignment of the franchise.

In so far as complainant seeks to be declared a stockholder, entitled to a definite number of shares of the stock which has been issued, he misconceives the true nature and extent of the relief to which he is entitled.    The right of Mulverhill and associates was clearly not to receive a definite number of shares of stock, but an equitable right to the ownership of one-fourth of the whole railroad when completed and equipped, together with its franchises, subject, however, to a prior lien in favor of Shaffer and Hughes for the amount advanced in money or property to build and equip the road.    The amount at which the capital stock was fixed was wholly immaterial as affecting this right. Had it been fixed at $1,000, or $1,000,000, the relative rights of the parties would have been unchanged.    What the party on one side of the agreement was to give, and the parties on the other side were to receive, was one-fourth interest in the entire corpo-

ration over and above the cost of construction.    While it was
expected that this margin of value would be evidenced by the
capital stock and second mortgage bonds, and that the profits of
the enterprise would, at least in part, be realized by the sale of
these, yet it cannot be held that, because none of such stock or
second mortgage bonds were ever sold or delivered, the parties
have no interest in the corporation which a court of equity will
protect.    Our view of the contract is most favorable to Shaffer
and Hughes; for, instead of limiting their liens for advances to
the amount of the first mortgage bonds, it gives them, what was
clearly contemplated by all the parties, a prior charge for the
entire cost of construction, amounting, as is alleged in the bill, to
$271,000.    As between Shaffer and Hughes on the one side, and
Mulverhill and his associates on the other, no bonds or mortgages
were needed to evidence or secure the right of the former to be
repaid their advances or their lien to secure repayment.    And
as we held that the lien of Shaffer and Hughes is not measured
or limited by the amount of the first mortgage bonds, so also we
hold that the interest of Mulverhill and his associates was in no
way impaired by the failure to issue to them shares of stock.    It
is well settled that a certificate of stock is not the stock itself.
It is a mere symbol.    It operates to transfer nothing from the
corporation to the shareholder.    It merely affords evidence of
his right.    Cook on Stock and Stockholders, sec. 14.    Whatever
amount of corporate stock might lawfully have been issued under
the plan of organization adopted, certainly Mulverhill and asso-
ciates were equitably entitled to one-fourth thereof.    It would
be a narrow and technical view which would deny him the right
in equity to have his interest defined and his rights enforced on
the sole ground that no shares of stock had ever been issued in
his name or delivered to him.    2 Clark & Marshall on Private
Corporations, sec. 551.

We pass now to the main question, the validity of the sale of
the corporate assets and franchise of the Vicksburg Railway,

Power & Manufacturing Company to H. K. Johnson, or to the Vicksburg Railway & Light Company, for the benefit of which he made the purchase. Complainant seeks to have this sale declared illegal upon several grounds: First. It is said that a street railway corporation, being quasi public in its nature, cannot, without legislative sanction or authority conferred in its charter, sell its entire assets and franchise, and, as this company was chartered under the general law (Code 1892, ch. 112), which gave no such power, the sale was *ultra vires*. Secondly. It is said that the sale is violative of sec. 5 of ch. 88, p. 127, Laws 1900, defining trusts and combines, and prohibiting a corporation, directly or indirectly, from purchasing or owning the capital stock, plant, or equipments of any other corporation engaged in the same kind of business and being a competitor. Thirdly. It is contended by complainant that a valid sale could not be made, except by unanimous consent of the stockholders, and, as this sale was made without the knowledge or consent of Mulverhill, it will be vacated on his application. In answer to the foregoing, it is said in behalf of defendants that, if the sale were either *ultra vires* or violative of the statute in relation to trusts and combines, only the state can interpose the objection. It is further argued that, as Mulverhill was not a stockholder, he was not entitled to notice of meetings of stockholders, and cannot complain that he was not notified of the called meeting at which this sale was authorized. And, finally, it is said that the corporation was in a state of hopeless insolvency; that liquidation was inevitable, and that under the general law and the rule announced by this court in *Berry* v. *Broach,* 65 Miss., 453 (4 South. Rep., 117), a majority of the stockholders had the right to sell the entire assets and franchise of the corporation.

On this branch of the case we again find it unnecessary to follow counsel in the discussion of these legal questions. Their decision, in our view, is not necessary to the proper disposition of this case; for, apart from these legal questions, the evidence

irresistibly impels to the conclusion that the sale was a fraud upon the rights of Mulverhill. Not only did it operate to hinder, defeat, and defraud him in the assertion of his rights as a party in interest in the corporation, but the evidence discloses a deliberate purpose on the part of the selling corporation, controlled by Shaffer and Hughes, on the one side, and of Johnson and the purchasing corporation represented by him on the other, to so hinder, defeat, and circumvent Mulverhill. It cannot be denied that every person participating in this sale and negotiations leading to it knew that Mulverhill was claiming to be a stockholder. They knew all the facts out of which his claim or interest arose. He was throughout treated as a stockholder, and in many places in the minutes of the corporation is listed along with the others as a stockholder. Both Shaffer and Hughes, who personally and through directors named by them, had the sole control of the corporation, in many ways and on many occasions recognized Mulverhill as possessing the rights of a stockholder. Indeed, Hughes, the vice-president of the corporation, had at one time been so solicitous as to avoid the imputation that he would sanction a fraud upon Mulverhill, that he announced at a meeting of the directors and had it entered on the minutes, that he recognized the right of Mulverhill and associates to a one-fourth interest in the stock and bonds. It is true that the interest of Mulverhill in the corporation was slight in comparison with the interest of Shaffer and Hughes. But, aside from the interest of the latter as creditors with a lien to secure their advances, his interest in the corporation differed from the interests of Shaffer and Hughes only in degree, and must be held as sacred and to be as sacredly protected as theirs. The railroad doubtless could not have been built but for the services of Shaffer in procuring the needed funds. Neither could it have been built, nor would it have been built, by Shaffer, but for the services of Mulverhill and his associates in obtaining the franchises and concessions. When we look to the particular relation which

Mulverhill sustained to the enterprise from its inception, the action of Shaffer and Hughes in deliberately ignoring him in the sale seems the more reprehensible.     Mulverhill first appears as one of the chief, if not the chief, promoter of the enterprise. It was mainly through his services and influence that the franchise and subsequent concessions were obtained.     When the corporation was organized, he was made secretary, and served as such until this sale was consummated.     It is not too much to say that he was throughout the most trusted and faithful servant of Shaffer and Hughes, and was their confidential adviser in many matters connected with the management and operation of the railroad.     Shaffer's telegrams promising to build the road solicited the "loyal support" of Mulverhill, and this support was given faithfully and without stint.     Shaffer should be no less loyal to Mulverhill.     Nothing that was done, either in connection with the fiscal management or local operations of the corporation, seems to have been concealed from him.     Not until the negotiations for this sale were in progress was there ever any denial or repudiation by any of the parties concerned of his interest.     Whatever may have been the views entertained by the parties as to his legal status as a stockholder, the fact that he had an interest in the corporation, subject only to a lien for the cost of its construction and equipment, and that this interest was of the same kind as of the interest of Shaffer and Hughes, seems never to have been questioned.

The meeting of stockholders held for the purpose of authorizing this sale was secretly held.     Not only is it admitted that Mulverhill was designedly kept in ignorance of this meeting, but it is frankly admitted that this was done because it was known that he would oppose the sale and might resort to the courts to enjoin its consummation.     After having for several years and in many ways recognized Mulverhill as having an interest in the corporation, or, what is the same thing, in its stock, and after having sought unsuccessfully to buy his claim

for $2,000, not, as was stated, because he had any real interest, but to preserve harmony and good will, the parties seem to have decided for themselves that he was not a stockholder—that he held no stock, and therefore might properly be ignored. If *bona fide.* ownership of stock, coupled with the possession of certificates duly filled out, had been then thought the test of the right to notice and to vote at the meeting, it is strange that those present at the meeting and voting should have thought themselves in a better attitude than Mulverhill. The whole authorized capital stock, so far as issued at all, had been filled out in blank and put in the possession of Shaffer as president. Neither he nor Hughes, the vice-president, had any certificates in his own name. The other persons present acted confessedly, to borrow the phrase of one of them, as "dummy" directors, appearing and voting as directors and as stockholders by virtue of certificates filled out in their names by Shaffer, and which they had perhaps never seen, and which they did not claim to own. Surely right-thinking men should not expect a court of equity to approve a sale of all the assets and franchises of a corporation, when authorized at a meeting thus secretly called and held and thus doubtfully constituted, when there is even a probability that one having a minority interest, and purposely ignored, may show that he has sustained an injury. It is hardly necessary to say that the fact that Mulverhill's interest is relatively slight in no way impairs his right to the protection of the court. The rights of minority stockholders as against the wrongful acts of the majority are frequently the subject of protection in courts of equity. While minorities must yield to the majorities in all matters lawfully committed to the latter, yet their inability to protect themselves against illegal, oppressive, or fraudulent measures adopted by the majority appeals strongly to the courts, which will be jealous in protecting their rights. Especially should transactions of stockholders and directors in control of corporations be closely scrutinized, when, as in this case, they have a personal interest

as creditors to be protected, and a conflict between duty and interest may arise.     Morawetz on Private Corporations, sec. 529; 3 Clark & Marshall on Private Corporations, sec. 628; Cook on Stock and Stockholders, 662; *Marsh* v. *Whitmore,* 21 Wall. (U. S.), 178 (22 L. ed., 482); *M. & C. R. R. Co.* v. *Woods,* 88 Ala., 642 (7 South. Rep., 108; 7 L. R. A., 605; 16 Am. St. Rep., 81).     See, also, 10 Cyc., 791.     This court has condemned as illegal an assignment by a corporation, although authorized by a vote of directors who were indorsers on debts of the corporation being preferred.     *Love* v. *Queen City Mfg. Co.,* 74 Miss., 290 (20 South. Rep., 146).

It was shown beyond question that at and for some time before the sale the company was in financial straits.     Its credit was almost, if not wholly, gone, and unsatisfied judgments for large amounts were enrolled against it.     According to some of the witnesses, the railroad could not have run many weeks longer, had not the sale taken place.     In the sense that its available resources were insufficient to meet the debts due and pressing for payment, the company was insolvent.     This fact may furnish an extenuation of the course pursued by the parties, other than Shaffer and Hughes, in making the deal with Johnson; but we do not think that the fact that the company was under a large bonded debt and was without funds to meet current expenses could be invoked by Shaffer and Hughes, who controlled the company, to justify their disposing of the entire corporate assets, including the franchise, in utter disregard of the rights of Mulverhill.     In determining the solvency or insolvency of a corporation, especially of a railroad or electric lighting company with a road or plant but recently completed, there are many elements of value which must be considered.     A franchise itself is often a most important element of value, especially where the concessions are liberal and carry the rights to the use of the streets of a prosperous and growing city.     Such a franchise, although not expressly or in legal contemplation exclusive, is, when once

availed of, practically free from all possible competition.    Corporations like these do not reach their normal earning capacity for some years after completion.    Those who project them must look in large measure to the future for enhancements in value and increase in earnings.    For this reason the values of shares in such corporations are not necessarily or usually measured by present earning capacity.    Again, it has become almost a matter of common knowledge that railroads in this country are not usually built with funds derived from the sale of capital stock, but by the sale of mortgage bonds.    The bonds, secured by a mortgage on the entire properties and franchises of the corporation, are in perhaps most instances sold at a discount, and thus upon completion of the railroad the corporation is mortgaged for more than it cost.    The order for issuance of the first mortgage bonds in this case authorized their sale at ninety cents on the dollar. It thus appears that it was the contemplation of all parties that the amount of the first mortgage debt alone would exceed the actual amount expended for construction.    It is difficult to believe that Shaffer and Hughes believed that this railroad, taken in connection with its franchises, would on completion be worth less than it cost.    Moreover, it was clearly contemplated that all the money needed to complete the railroad should be furnished or obtained by Shaffer.    It was not expected that moneys advanced for completing and equipping the road should be treated as a current debt presently payable, and that the revenues from the operation of the road should be diverted from the payment of operating expenses, fixed charges, and other current expenses, and applied to the construction or extension and equipment of the railroad.    Yet from the evidence it is not certain that a large part of the current earnings were not so used.    It seems probable that the lack of credit and the financial embarrassments of the corporation arose in part from the existence of the recorded mortgages, amounting to $300,000, to secure the unsold first and second mortgage bonds, and in part from the applica-

tion of current revenues to pay for construction and extension of the road. Again, as to the time when the advances by Shaffer and Hughes were to be repaid, it is manifest that it was expected that the cost of construction should be secured by the bonds of the company and that the interest only on such sums would have to be met from the current revenues.

Even if, as contended by appellees, the company was hopelessly embarrassed, it seems unaccountable that Shaffer and Hughes would have denied to Mulverhill, their associate, the right to counsel and coöperate with them as to the best disposition to make of the corporation. It seems strange, also, that Johnson was willing to purchase and pay a substantial price for the interest of Mulverhill's associates, and even more singular is it that they would have bought and paid $1,000 for the claim of McFarland, whose only interest was based on a promise by Mulverhill to allow him a fraction of whatever he might make out of the enterprise. Whatever view Shaffer and Hughes may have entertained as to the insolvency of the company, and however anxious they may have been to sell the railroad, they never offered to take for themselves less than what it had cost them, plus a reasonable interest, and this amount, without discount, was secured to them in the sale by first mortgage bonds of the new corporation. On the question of insolvency and of value of the corporation and its franchises, it is significant, also, that Shaffer and Hughes and their attorneys seem to have feared the result of a public sale to the highest bidder under the executions against the company. They must have known that under these executions a sale thoroughly advertised would speedily have developed whether the properties and franchises possessed a value in excess of the debts and incumbrances. The fact that at the sheriff's sale under the executions a bidder was found willing to pay nearly $40,000 for the railroad and franchise, subject to all debts, is persuasive that the railroad, the electric light plant and the franchises, and the good will of the company,

were not considered valueless. Johnson himself certainly considered the properties and franchises purchased by him worth more than the indebtedness due by it; for, as the price therefor, he assumed to pay the entire bonded indebtedness, amounting to $300,000, to pay all the floating debts, including the judgments, and also to assume the obligations of Shaffer to Mulverhill and his associates. The new corporation organized by him to take over his purchase issued first mortgage bonds largely in excess of those of the old corporation, and fixed its capital stock at $500,000. This projection of the new corporation did not indicate any shrinkage in values or any retrogression of the enterprise.

Neither Johnson nor the new corporation can avail of any right acquired under the executions on the judgments against the railroad company. He had already bargained for or purchased both the judgments and the properties sought to be sold under them. The sale was confessedly brought about by him to allow him to buy in the assets of the railroad company and strengthen his title. Without regard to whether the sheriff acted legally or properly in demanding immediate payment of Johnson's bid, and refusing reasonable time to go to the bank and procure the money to pay the bid, we hold that the sale was part and parcel of the scheme which was intended to circumvent and defeat Mulverhill, and which we have already condemned as fraudulent as to him. Entertaining the foregoing views, we would not hesitate to set aside the sale and order a restitution of the property to the selling corporation, or to a receiver, if we thought that it was now possible to restore the status and afford complainant full and adequate relief by such a course; but, in view of the fact that Johnson and the new corporation have paid debts and judgments existing against the Vicksburg Railway, Power & Manufacturing Company, and are now operating the railroad, and the public interest and convenience might seriously suffer by granting such relief, and

since it is quite probable that mortgage bonds of the new company have passed into the hands of innocent purchasers, and that this might embarrass and complicate the granting of full relief by a receiver, we think the rights of complainant will be better protected through a personal decree against the two corporations and against Shaffer and Hughes and Johnson for whatever amount his interest in the corporation may be ascertained to have been worth.  As we have seen, the obligation in favor of Mulverhill first made by Shaffer was adopted by Hughes when he became associated with Shaffer, and subsequently by his distinct recognition of the interest of Mulverhill, and this obligation Johnson expressly agreed in his contract of purchase to assume; and as the Vicksburg Railway & Light Company was organized by Johnson to take over his contract, and did in fact do so, it came under a like obligation.  Apart from these contracts and assumptions, the power of a court of equity in cases like this to either vacate the sale and afford relief through a receiver, or to render a personal decree against the officers or directors participating in the fraudulent sale, is well settled.  2 Clark & Marshall, Priv. Corp., § § 540, 541.

The decree must be reversed and the cause remanded for an accounting as to the value of the interest of Mulverhill in the corporation—the Vicksburg Railway, Power & Manufacturing Company—at the time of the sale to Johnson, and for a personal decree under the prayer for general relief against Shaffer and Hughes, and the corporation organized by them, and against Johnson and the corporation organized by him, for the value of such interest.  In the ascertainment of the worth of the corporation over and above its debts, the court and commissioner should consider not only the value of the railroad and electric light plants and properties in the light of their cost, earning capacity, and probable enhancements of value and earnings, but also the railway and lighting franchises and the good will of the company.  In fact, all the circumstances and conditions

then existing, tending either to enhance or diminish value, should be considered. In ascertaining the then indebtedness of the company, as affecting such valuation, the amounts advanced in money and property by Shaffer and Hughes for the construction and equipment of the plant should be estimated as if secured by mortgage bonds, and not as a debt presently demandable. Shaffer and Hughes must not be denied the full benefit of their contract for the sale to the railroad company of their electric light plant and its franchises. No complaint was ever made of any unfairness in the purchase, and Mulverhill knew of and assented to it. As mortgage bonds amounting to $50,000 were turned over to Shaffer and Hughes in part payment therefor, the company will be considered as owing them that amount because of such purchase. But, in addition, they were paid $100,000 in stock of the company—one-third of the total capital. They must, therefore, be held entitled to one-third of what the capital stock represented, viz., the profits of the enterprise. This one-third must, therefore, be first set aside in the calculation, and the amount of the interest which Murverhill and associates were entitled to will be one-fourth of the remaining profits of construction as hereinbefore defined. The interest of complainant in this will then be the fractional share shown in the pleadings and evidence, as to which there seems to be no dispute. The value of complainant's interest, thus ascertained, with legal interest since the sale, will be the measure of his recovery.

*Reversed and remanded.*