217 So.2d 257 (1968)
John F. WOOD, Marshall Betty and Lillie Mae Betty
v.
GULF STATES CAPITAL CORPORATION et al.
WALKER BOAT-BARGE RENTALS, INC., a Mississippi Corporation
v.
GULF STATES CAPITAL CORPORATION.
No. 44946.
Supreme Court of Mississippi.
November 4, 1968.
Rehearing Denied January 20, 1969.
*259 Wiesenburg, Oswald & Lockard, Cumbest, Cumbest, O'Barr & Shaddock, Pascagoula, for appellants.
Eaton, Cottrell, Galloway & Lang, Gulfport, Albert Sidney Johnston, III, Pascagoula, for appellees.
PATTERSON, Justice:
This is an appeal from a chancery court proceeding in Jackson County which originated with a bill of complaint filed by Marshall and Lillie Mae Betty against Southern Crab Company, Inc., Gulf States Capital Corporation, C.C. McCurley, and others. The complaint prayed for a finding of insolvency and the appointment of receivers to take over Southern Crab Company, Inc., for an injunction against foreclosure on a deed of trust executed by Southern Crab Company, Inc. in favor of Gulf States Capital Corporation, for cancellation of deeds of trust executed by Walker Boat-Barge Rentals, Inc., and for an accounting as well as a declaration of priority of liens. A petition for appointment of receivers and an injunction against foreclosure by Gulf States Capital Corporation, was filed some months later and was granted by two separate orders of the court. From a decree ordering a special commissioner's sale of all the property of Southern Crab Company, Inc., declaring deeds of trust held by Gulf States Capital Corporation to have a first priority, upholding the validity of deeds of trust executed by Walker Boat-Barge Rentals, Inc. and which found Marshall and Lillie Mae Betty liable for amounts paid to them by Walker Boat-Barge Rentals, Inc. to satisfy the notes and deeds of trust of Walker Boat-Barge Rentals, Inc., the complainants Betty and Wood, and intervenor Walker, appeal.
Marshall and Lillie Mae Betty, appellants, hereinafter referred to as Betty, owned and operated a seafood processing plant known as the Southern Crab Company prior to and including a portion of 1964. The plant was located in the Bayou Casotte area of Jackson County. The company had been in financial difficulties for some time and in an attempt to assure payment of his creditors, Betty began negotiations during March of 1964 with C.C. McCurley, one of the appellees, hereinafter referred to as McCurley, to sell his business. Shortly thereafter, McCurley, on behalf of himself, Mrs. Ann R. Smith, and Albert Sidney Johnston, both appellees, offered Betty $200,000 for Southern Crab Company. In order to finance the purchase, McCurley contacted a Mobile bank who referred him to Gulf States Capital Corporation, appellee, a Florida concern. After negotiations, Gulf States Capital Corporation, hereinafter referred to as GSCC, agreed to make the necessary loan. As a prerequisite, however, GSCC required that a corporation be formed by the proposed purchasers to consummate the loan for the purchase and to operate the business. GSCC also required, as a prerequisite to the loan, that it be allowed to purchase 25% of the total stock of the proposed corporation; that it be allowed to appoint two of the four directors thereof; that it receive a first deed of trust on all real and personal property of the purchasing corporation; and that it receive a conditional assignment of two notes and deeds of trust executed by Walker Boat-Barge Rentals, Inc., intervenors and appellants, which were to be conveyed to the purchasing corporation as a part of the Betty properties. Additionally, *260 McCurley was personally obliged to deposit $15,000 in stocks of other corporations as collateral. Subsequently, a firm agreement was reached between Betty and the proposed corporation for the sale of the business for $200,000. Thereafter, Southern Crab Company, Inc. was organized under the laws of Delaware and qualified to do business in Mississippi. This corporation consisted of four shareholders owning stock in the following percentages: McCurley, 30%; Mrs. Ann R. Smith, 30%; Albert Sidney Johnston, 15%; and GSCC, 25%. The president and general manager of the corporation was McCurley, who, by mutual agreement, was primarily responsible for management of the enterprise. Mrs. Ann R. Smith was employed by the corporation as the bookkeeper. Marshall Betty was retained on a three-year contract basis as maintenance supervisor of the new business.
The sale was consummated on April 30, 1964, and Southern Crab Company, Inc., hereinafter referred to as Southern, received all of the real and personal property of Southern Crab Company, including notes and deeds of trust executed by Walker Boat-Barge Rentals, Inc., hereinafter referred to as Walker. It was agreed that no money should pass immediately to Betty in this transaction, but that the purchase price would consist of the assumption of debts owed by Southern Crab Company and the issuance of unsecured debenture notes to Mr. and Mrs. Betty. The debts assumed were, in round figures, the sum of $117,280. The remainder of the purchase price, again in round figures, $82,553, was evidenced by unsecured debentures payable to the Bettys at the rate of $10,000 per year. This assumption included two prior recorded deeds of trust on the property, one to Dan Vincent, Inc. for the purchase of a fish meal dryer, and one to Gulf Vitamins, Inc. for materials furnished, and two prior recorded conditional contracts, one to Harrison & Ellis, and one to Toledo Scales Corporation.
Pursuant to the purchase agreement, $90,000 was loaned to Southern by GSCC. Of this sum Southern immediately used approximately $70,000 to pay creditors and to secure cancellations of deeds of trust, mortgages, and judgments. More specifically, $64,341.14 was paid to the Pascagoula-Moss Point Bank to satisfy an indebtedness incurred by Betty for construction and former operations of the business. A judgment in favor of Dixie Sheet Metal Company in the sum of $1,950 was paid; a judgment in favor of Southern Can Company for $1,700 was likewise paid, and a payment of $1,959.75 was made to Dan B. Vincent in order to bring current a conditional sales contract on the fish meal dryer. These payments reduced the total liabilities assumed by the company to approximately $47,204.69. The remaining outstanding liabilities of the old company consisted of open accounts to some twenty-nine creditors in the amount of $17,829.19. The remainder was composed of a $28,000 balance on the fish meal dryer and an attorney's fee, for prior services in the amount of $1,375. The company retained $4,814.61 for operating expenses. The remainder of the $90,000 loan, the sum of $15,000, was retained by GSCC to be later disbursed to the company for operating expenses.
GSCC was to be repaid at the rate of $1,875 per month over a period of sixty months. To secure its loan GSCC took a promissory note from Southern for $90,000 which was secured by a deed of trust on all the real and personal property of the company. By agreement, title to the two notes and deeds of trust executed by Walker was placed in GSCC by a conditional assignment should Southern default on any of its payments. GSCC also reserved the right to proceed against the $15,000 security deposited by McCurley in the event of default on any of the notes. The deed of trust to GSCC and the assignment of the Walker notes and deeds of trust were promptly recorded in the chancery clerk's office of the county.
*261 As mentioned, the newly-formed company was organized under the laws of Delaware and qualified to do business in Mississippi. It had an authorized capital of $50,000 and a paid-in capital of $2,000. The organizing stockholders of the new corporation, C.C. McCurley, Ann R. Smith, Albert Sidney Johnston, and Gulf States Capital Corporation, purchased stock in the percentages listed. This composed the paid-in capital. By agreement of the stockholders, sale of additional stock was restricted to the original purchasers in the same percentages. It was also agreed between GSCC and Southern that the latter was to receive no additional financing without the consent of GSCC and was to furnish them monthly operating statements, quarter-annual balance sheets, and periodic profit and loss statements.
The new business was plagued with difficulties from the outset. The day before the sale a fire damaged the plant to the extent of $1,717.49. The day following the sale the plant was closed by injunction until obnoxious odors resulting from the fire and partially destroyed fish meal, could be eliminated. The plant's water and refrigeration systems did not function properly and required repair. One of the appellants, John F. Wood, was requested by the company to repair the refrigeration system before the plant could operate as planned. His claim for services rendered, being unpaid, was later reduced to judgment.
The primary functions of the plant were the processing of crabmeat for the market and combining the "crab scrap" with "trash fish" to make fish meal. Payment was stopped on the first fish meal sold by the new company as Betty was indebted to the purchaser. It was necessary for GSCC to advance the $15,000 for operating expense to the company during May, June, and July. Southern made payments on its notes to GSCC during May and June, but defaulted thereafter. In August 1964 GSCC agreed to defer payments from the company with the hope, evidently, that this would permit the foundering organization to reach full production. Only one payment was made to Dan Vincent on the fish meal dryer, an essential item to the fish meal process, and this account became delinquent.
It soon became apparent that Betty and McCurley were in hopeless disagreement over the management of the plant. Betty was experienced in the seafood processing business and disagreed with the management policies of McCurley who was inexperienced. Discussions were held with Mr. James H. Boroco, President of GSCC, by both parties concerning the problems relating to the management of the company. He suggested on two occasions that Betty be allowed to take over the management of the company, but this idea was rejected by the other stockholders. In November 1964 Betty was discharged by McCurley for alleged violation of his contract.
In September 1964 another fire had taken place in the plant. GSCC placed a portion of the insurance proceeds from the fire damage in escrow and relinquished the balance to Southern for its use. The destroyed property was not replaced and this caused further dissension between Betty and McCurley. The sales contract on the fish dryer was foreclosed in November 1964 by Dan Vincent. It was sold to Delta Processors who agreed to let the dryer remain in the plant for a percentage of the fish meal produced thereafter. During January 1965 default judgments were taken against Betty and Southern by Turner Supply Company and Watts-Spann Insurance Company. Both of these suits were based upon the debts of Betty which had been assumed by the company. There were also amounts due on the chattel deeds of trust of Toledo Scales Corporation and Gulf Vitamins, Inc., which had been assumed by the company. On November 8, 1964, GSCC notified Southern that the deed of trust held by it would be foreclosed and action taken against the security stock pledged by McCurley unless payments due were brought current by February 15, 1965. On February 10, 1965, McCurley received a letter, dated February *262 1, 1965, from Mr. Baroco, stating that if management of the plant was not turned over to Betty, GSCC would institute foreclosure proceedings against the company.
On January 4, 1965, A.S. Johnston, a stockholder and the attorney for Southern, advised Walker by phone that the notes and deeds of trust executed by such company had been assigned to Southern. He requested that future payments be made to such assignee. This phone call was followed by a letter of January 6, 1965, to Walker advising of the assignment and requesting payments to be made to Southern, the assignee. Subsequently Mrs. Walker, the secretary-treasurer of Walker Boat-Barge Rentals, Inc., contacted Marshall Betty concerning payment of the notes. He advised her that she could make payments to him as she had done in the past. The evidence reflects, in explanation of the above, that Betty had sold some real estate to Mr. and Mrs. Walker and had assigned the notes and deeds of trust given therefor to a local bank and that it had been the custom of the Walkers to make their payments to Betty who in turn paid the bank. On February 1, 1965, Walker forwarded its check to Betty for $37,448.87, the entire balance due on the notes. Betty promptly converted the check into cash. He carried this cash to the office of his attorney and after relating somewhat his business relationship with the Walkers of Walker Boat-Barge Rentals, Inc. and Southern, sought advise as to what disposition should be made of the money. He was advised to deposit the cash in a local bank in the name of his wife.
Thereafter, the funds were transferred to a special account of the attorney and were used to pay the former debts of Betty which had been assumed by Southern, but which remained unpaid. By the use of cash these accounts were substantially discounted, but nevertheless $35,147.35 was paid by Betty to his creditors. Of this amount $20,000 was used to redeem the fish meal dryer which had been sold in foreclosure, and to pay an attorney's fee of $5,000. The remaining proceeds from the notes, $2,468.41, were paid into court on February 11, 1965, when Betty filed suit in the Chancery Court of Jackson County. This suit was against Southern Crab Company, Inc., Gulf States Capital Corporation, Albert S. Johnston, C.C. McCurley, Ann R. Smith, James Boroco, and Patrick Emmanuel, a director of GSCC. By his bill of complaint he requested the court to find that he had properly applied the funds out of the Walker notes in satisfaction of his prior obligations which had been assumed by Southern, that the Walker notes and deeds of trust be cancelled, that an adjudication of his rights under the debenture notes issued to him by Southern as part of the purchase price of his plant be made, and that he be adjudicated to have a first lien on all of the assets of Southern. He further requested that the insurance proceeds paid to the company and GSCC for the fire loss be applied to restore the damaged property. He requested that Southern be declared insolvent and that a receiver be appointed to administer its affairs and that a determination be made of the priority of liens. He additionally requested an injunction against GSCC forbidding it to foreclose its deeds of trust, and for an accounting to determine the credits and balances, if any, due the Bettys, and for a discovery and disclosure of the interests of each of the organizers of Southern. He also prayed the court to adjudicate that he did not wrongfully breach his contract of employment. Alternatively, in the event the debenture notes were not given the first priority, then he prayed for a money judgment against the individual defendants for the value of such notes.
On the date the suit was filed Betty sent a letter to both Southern and GSCC advising them of his collection of the money, his use of it, and enclosed an itemized account of his expenditures.
In between time, on February 8, 1965, GSCC had written Walker notifying it of the conditional assignment by Southern of *263 its notes and deeds of trust to GSCC. This letter advised that all future payments should be made to GSCC, and payments to others would be made at Walker's peril. This letter was not received by Walker until February 10, 1965, and it in turn advised GSCC that it had satisfied the notes and deeds of trust by payment to Betty on February 1, 1965.
On February 16, 1965, the Board of Directors of GSCC met and approved foreclosure of the deed of trust executed by Southern. However, no attempt was made to do so or to proceed against the collateral stock deposited by McCurley. GSCC notified Walker on February 22, 1965, that payment of the notes was expected under the terms of the assignment. No attempt was made to foreclose these notes until May 17, 1965, at which time a petition was filed by Betty requesting that the foreclosure be enjoined. A temporary injunction was granted on June 4, 1965, and on the same day Walker intervened in this action.
The plant continued to operate, though hopelessly insolvent, until June 3, 1965, at which time McCurley left and receivers were appointed to take over the company by direction of the court on July 1, 1965.
The bill of complaint of the Bettys, their petition for injunction, the intervening complaint of Walker, the petitions of intervention by general creditors John F. Wood, General Commission Company, George L. Lewis, and Steve J. Marinovitch claiming to be priority creditors, and the claims of priority of the Mississippi Unemployment Security Commission and the Internal Revenue Service of the United States of America, the cross bill of Gulf States Capital Corporation together with the appropriate answers to the various bills of complaint, supplemental bills of complaint and cross bill, were all consolidated and heard in an extensive trial at the conclusion of which the court decreed, among other things, the following:
(a) GSCC to have a prior lien against all of the real and personal property of Southern described in its deed of trust and all increments thereto except the fish meal dryer. GSCC to have a prior lien against the promissory notes of Walker assigned by Betty to Southern and conditionally assigned by that company to GSCC; this lien being in the amount of $75,000 plus interest from April 30, 1964, less, however, the two payments made by Southern.
(b) That the above lien attach also to the sum of $3,586.33, representing hazard insurance losses paid into the court by GSCC; to the sum of $1,714.49, representing insurance monies paid into the registry of the court by Betty; to attach to the sum of $2,468.41 representing the balance of the Walker notes, which was paid to the registry of the court by Betty. The total, $7,769.23, was decreed to be paid to GSCC and credited against its first lien.
(c) Credit was given Betty for such sum as a dryer sold by Dan B. Vincent, Inc. to Betty might bring at foreclosure, but not to exceed, however, the amount of $20,000 and to which credit Walker was expressly subrogated.
(d) GSCC was adjudicated to have an additional lien in the amount of $15,000 operating expenses, together with interest, such lien being subordinate, however, to a credit in favor of Betty in the amount of $14,980.46 (the amount paid by Betty to debts which had been assumed by Southern) to which credit Walker was subrogated.
(e) The claim of John F. Wood and the other general creditors was held to be subordinate to the liens adjudicated in favor of GSCC.
(f) The debenture notes issued by Southern to Betty were adjudicated to have no priority and to not constitute a lien on the property of Southern.
(g) The temporary injunctions were dissolved and title to the property of Southern was vested in a special commissioner *264 for the purpose of being sold so that the proceeds could be applied upon the debts of the insolvent corporation.
(h) Walker was adjudicated to have and recover from Betty the sum of $37,448.87 less the sum of $2,468.41 paid into court, with interest. This was subrogated to all of the credits accorded Betty under the provision of the court's decree.
(i) The notes of Walker were not discharged, but held to be subsisting obligations secured by valid deeds of trust, but subject to the credits above adjudicated. The decree recognized the right of Walker to bring such notes current of the past-due installments and interest, plus an attorney's fee of 10% of such past-due total, with the provision that any payment on the principal and interest should be credited on such notes, and the total amount paid be subject to the first lien of GSCC.
(j) The court further decreed that such credits as are allowed against the notes of Walker should be in turn allowed on the judgment of Walker against Betty.
(k) The court made provision for an attorney's fee, but held the same to be subordinate to the credits of the Internal Revenue Service though superior to the claims of all other parties.
(l) The court adjudicated Southern to be insolvent and in receivership under a former decree. This decree was consolidated with the present decree for execution. A provision for the sale of the property toward the payment of the credits in accord with the priorities was adjudicated.
From this decree Betty, Walker, and John F. Wood appeal.

THE APPEAL OF MARSHALL AND LILLIE MAE BETTY

I.
Betty first argues that the immediate consideration for the sale of the Southern Crab Company property to McCurley was that the proposed purchasers would assume the debts stemming from his operation of the company and pay these creditors. He contends that the sale agreement was made prior to any discussion by the appellees as to the formation of a corporation; that in view of this agreement being ratified by the corporate organizers the appellees were not entitled to the protection of a corporate guise as against the Bettys, but were jointly and severally liable to them for the performance of the sale contract. The lower court held that "the Southern Crab Company, Inc. was organized as a corporation in legal effect and that its stockholders were not liable personally and that it was not insolvent on the day of its organization." The appellant cites Urschel v. Stone, 198 Miss. 105, 109, 21 So.2d 466, 467 (1945), in support of this point, which held, "there are times when the fiction of corporate entity is to be ignored, especially when, as here, the transactions are between the parties as stockholders and themselves as individuals. * * *" signifying there could be instances which might arise whereby the stockholders would not be relieved individually of a contract upon the formation of a corporation where the contract was merged into the corporation. The factual situation here, however, is not persuasive to this point of view as the record abundantly reflects there was in fact no separate contract between Betty and any of the individuals who later became stockholders of the company. In fact, Betty testified that he realized McCurley, when speaking of the proposed purchase, was speaking for "the company he was going to form. Southern Crab Company, Inc." There is no evidence that GSCC at any time considered making the loan to any individual, but would only do so upon a corporation being formed and upon there being a separate pledge of stock by McCurley as additional collateral. We conclude that the argument of Betty is unavailing on this point as it fails in its first assumption that a prior contract existed between Betty and the subsequent *265 stockholders when in fact the proof is to the contrary.

II.
The second point urged by Betty is that he retained an equitable lien on all the assets, real and personal, conveyed by him to Southern, including the Walker notes and deeds of trust assigned to such company by Betty, and the appellees were charged with the duty of paying the assumed creditors. As we comprehend the argument of Betty on this point, it arises from a statement found in Anaconda Aluminum Company v. Sharp, 243 Miss. 9, 16, 136 So.2d 585, 587-588, 99 A.L.R.2d 1307 (1962) wherein it is stated:
It is a general rule "Where a fund has been set apart for the payment of an obligation or class of obligations, or a fund in the hands of a third person has been so designated as to require the latter to make payment out of it to a creditor, the general rule seems to be that the person for whose benefit the fund was so set apart or designated acquires a right to have it applied as directed, which right will be given a preference over the rights of other creditors in case of the debtor's insolvency; provided, of course, that no element of fraud or other superior equity enters into the transaction."
Betty contends that the funds which came into the hands of Southern for the purchase price, which included the assumption of the indebtedness of Betty, were designated for payment, and as the vendor he retained a lien thereon to assure their liquidation. The court held that GSCC was not an innocent purchaser, but was fully advised of every phase of the purchase transaction prior to the purchase. It further held that GSCC knew the debts of Betty were assumed by Southern. It is apparent at the outset that if Betty is to recover on this point, he must do so on the theory of there being an express vendor's lien retained, or if not, upon the theory that he had an implied vendor's lien. The court below made no express finding as to there being a retained vendor's lien, but did specifically hold that the lien of GSCC, which was evidenced by notes and deeds of trust, constituted a first lien. The only evidence of an express lien, if in fact it be such, is found within the debentures received by Betty as a part of the consideration for the sale of the company. These debentures indicate that no express vendor's lien superior to GSCC was retained. They state that they are "junior in dignity to the rights of the creditors of this company, but are prior in dignity to the rights of stockholders of this company," thus indicating their status as to priority. While true that GSCC was a stockholder, it is also evident that it was also the source of a loan far in excess in value to that of its position as a stockholder. By the terms in the debentures Betty was superior to GSCC as a stockholder, but junior to it as a creditor of the company. The question for determination on the point is whether GSCC became a creditor at the time it advanced the money for the purchase of the Betty property. A resume of the facts will be helpful in answering this question. There can be no doubt that Betty knew that a loan was being made to Southern to effectuate the purchase, as Betty himself testified when queried as to the position of GSCC that it would furnish the money, meaning, of course, the purchase money. In addition, there is no doubt that Betty knew a deed of trust had been given to GSCC to secure the purchase loan as he was a witness to the signatures of the makers thereof. We note also that Betty obtained the benefit of the money advanced for the purchase as $70,000 or more went immediately into paying the direct obligations of Betty. We mention only the payment of the $64,341.14 to the Pascagoula-Moss Point Bank to retire a previous loan of Betty. A creditor by simple definition is, "a person to whom a debt is owing by another person who is a `debtor.'" Black's Law Dictionary (4th Ed. 1957). Applying either common or legal knowledge, we can arrive at no conclusion other than GSCC was a creditor *266 of Southern and that Betty was aware of this fact as he participated in the negotiations preceding the loan and was a subscribing witness to the deed of trust securing it. Though we believe this disposes of the point, there is another reason that Betty cannot prevail upon this assignment of error. This is, the sale was made by Betty for the purpose of enabling Southern to mortgage the assets conveyed to pay the purchase price. In 55 Am.Jur. Vendor and Purchaser section 473 (1946) it is stated:
Where the conveyance is made for the purpose of enabling the grantee to resell or to mortgage the land and with the money so acquired to pay the purchase money, this is held wholly inconsistent with any intention to retain an implied vendor's lien and is therefore a waiver thereof, for had he designed to retain the equitable lien, it might have continued such an encumbrance upon the land as would have defeated the effort to obtain the loan to be secured by the mortgage * * *.
In Clower v. Rawlings, 9 Miss. (9 Smedes & M.) 122, 128-129 (1847), a case resolving the priority of liens as between a vendor and the holder of a deed of trust for monies advanced for the purchase of the property, this Court held:
But testing this case according to the less strict rule, and giving consideration to its peculiar circumstances, and they amount to evidence of a manifest intention to rely no longer on the equitable lien subsisting on the land. After retaining the lien by withholding a deed of conveyance of the land for nearly two years, he consented to execute a deed of conveyance. This conveyance he was persuaded to make for the avowed purpose of enabling his vendee to raise money by a mortgage to the Union Bank, and thus to aid her to pay the balance due upon the purchase-money. Had he designed to retain the equitable lien upon the land, it might have continued such an incumbrance upon the land as would have defeated the effort to obtain the loan to be secured by the mortgage, one of the objects of which loan was to raise money to liquidate the balance due upon the purchase-money. The conveyance was, therefore, an act evincing a determination to abandon the equitable lien, because it was an agreement to rely upon an express pledge of the land for the payment of the balance due upon the purchase-money.
Similarly Betty, by conveying for the express purpose of the vendee pledging the property as collateral in order to obtain the purchase money waived the implied vendor's lien that would have arisen by operation of law. We conclude the appellant's argument on this point is not persuasive.

III.
As a third point Betty contends the appellees failed to protect him from suits and foreclosure proceedings instituted by creditors whose claims had been assumed as a part of the immediate consideration for the purchase of appellants' plant, and the appellants were entitled in equity to apply the proceeds of the Walker notes to such payments. As a basis for this contention Betty argues that the company, or the individual stockholders, had irrevocably breached their agreement with the appellants as early as November 1964 by not paying the debts they and the company had assumed as part of the consideration for the plant, and consequently he had the right, in equity, to use the funds of the company, due them by his assignment, to pay these creditors. Assuming for the purpose of this opinion that these facts are true, but not so deciding, we reject his argument upon the simple basis that no litigant has the right to take the law into his own hands. At best Betty was obligated to honor his own assignment, and if it was his opinion that Southern had not lived up to its contractual obligation, he had a right in law to maintain a suit for its breach. The conversion of another's funds, though it be used for what was regarded to be a legitimate *267 purpose, cannot be condoned by this Court or a court of equity. The appellants cite no case or authority to the contrary.

IV.
It is next contended by Betty that GSCC was not entitled to the benefits of the Walker notes as the assignments from Southern to it were conditional, and the conditions precedent having not been met, Southern was entitled to the proceeds of such notes and since that company had not paid off the assumed loans, the conditions and nonpayment being known to GSCC, Betty had the right under these circumstances to apply the proceeds to the payment of his creditors. We gather from this argument of appellant that it is meant that GSCC's lien did not extend to these notes in priority to Betty. The assignment of the Walker notes was not unconditional as it was qualified as follows:
This Assignment is to take effect as a full Assignment if when, and only when Southern Crab Co., Inc. should default in its payments on the aforesaid Note and Deed of Trust. As long as Southern Crab Co., Inc. is current in the payments on the aforesaid loan they will receive all the payments on the Notes and Deeds of Trust hereby assigned for its account.
The appellants' major premise in argument of this point is based upon the following statement: "If Gulf States Capital Corporation was not entitled to the proceeds of the Walker Boat-Barge Rentals, Inc. notes on February 3, 1965 when they were paid, and if as between the Bettys and Southern Crab Company, Inc. the Bettys were entitled to apply the proceeds of such notes to the payment of their creditors whose demands had been assumed by Southern Crab Company, Inc., Gulf States Capital Corporation should not have been decreed to be entitled to again receive the proceeds of these notes." (Emphasis added.) The fallacy of this argument, as we view the matter, is the assumption by Betty that he was rightfully entitled to apply the proceeds of the notes to any account whatsoever. In discussing the previous point we attempted to point out that the use of the funds wrongfully in his hands was tantamount to a wrongful conversion and we dispose of the present point upon the same theory. We again note a complete dearth of authorities to support the position of appellant. It is noted, however, in passing, that GSCC was not decreed, as contended, to be entitled to again receive the proceeds of these notes, as the court specifically found Betty entitled to "a credit" of $14,980.46, the amount used in payment of creditors, and subordinated GSCC thereto. We opine that it was the chancellor's theory that this amount was expended in the elimination of the loans assumed by Southern, and that GSCC would not be entitled to the notes as well as to a credit in like amount for the payment of the assumed loans. For this reason Betty was credited with the payment of the assumed loans and Walker was subrogated so that he could be given credit for this amount when proper payment of his notes is made. The appellants' argument in this regard is not persuasive.

V.
The appellants next urge that the court below erred in not granting Betty an equitable lien on all the property sold to Southern, including the Walker notes, erred in limiting the priority of Betty to a first lien on the dryer, and erred in granting the Bettys a second lien for payments made to the assumed creditors as part of the purchase price. We think this argument is without merit, primarily for the reason that Betty is in no position to complain, as he was, by his testimony, a wrongdoer in a court of equity. However in reviewing his argument with regard to the $14,980.46 paid upon the assumed loans, it is at once observable, as stated above, that Betty was given a credit prior to GSCC even though the payments were made with another's money. What Betty was not allowed as a priority lien was the expenditure of another's money ($20,000) for the redemption *268 of the fish meal dryer and attorney's fee, neither of which was one of the loans assumed at the time of purchase and was not therefore a direct or an indirect obligation of GSCC.
The payments on the fish meal dryer were on a monthly basis pursuant to a conditional contract which was conveyed at the time of sale. Though these payments had been in default leading to a foreclosure sale and purchase by Delta Processors, the dryer remained in the plant of Southern subject to payments to Delta from the proceeds of the meal processed through it. It was not in the same category as the loans assumed by Southern since any arrears on it that then existed could have been brought current by payment of a relatively small sum. The personal obligation that Betty doubtless felt to his former creditors did not exist as to the dryer, as it had been foreclosed and title vested in a third party. The trial court did not accord a prior lien on the dryer to Betty for the obvious reason that he acted as a volunteer in prepayment of a debt of others, a debt that could have been satisfied with relatively small monthly payments, thus causing the capital expended to be diverted from the operating capital of Southern. We do not mean to state by this that the payment of the assumed loans was an obligation of GSCC, but rather we do uphold the theory of the chancellor wherein he stated: "The theory being that those assumed claims were part of the purchase price, that Gulf States Capital Corporation knew they were unpaid, and as in a construction loan simple justice required that they see to it that the money advanced be applied on the purchase price and their lien be limited to that amount until the assumed debts were paid." We think the argument of Betty in this regard is without merit.
There are other assignments of error by Betty, several of which were argued in his brief; others were not. We have considered all such assignments and find them to be without merit, and since some, if not all, of them are repetitive of that which has been stated in this opinion, we refrain from alluding thereto, for brevity, except to say that the objection of Betty to the confirmation of the sale directed by the court is not well taken as Mississippi Code 1942 Annotated section 1385 (1956) was not complied with.

THE APPEAL OF WALKER BOAT-BARGE RENTALS, INC.
Walker argues that the entire transaction between Betty and Southern on April 30, 1964, as to the transfer of the Walker notes and deeds of trust, was void on its face. This assertion is made for the reason that Southern, though organized as a corporation under the laws of Delaware, had not qualified to do business in this state at the time of the sales transaction and did not become qualified until May 18, 1964. He urges in support of this position that Mississippi Code 1942 Annotated section 5309-221 (Supp. 1966) is controlling, and he quotes therefrom as follows:
No foreign business corporation for profit shall have the right to transact business in this state until it shall have procured a certificate of authority so to do from the Secretary of State. * * *
He does not mention, however, the subsequent Mississippi Code 1942 Annotated section 5309-239 (Supp. 1966) which states in part as follows:
The failure of a foreign corporation to obtain a certificate of authority to transact business in this state shall not impair the validity of any contract or act of such corporation, and shall not prevent such corporation from defending any action, suit or proceeding in any court of this state.
Additionally, the case of Parker v. Lin-Co Producing Co., 197 So.2d 228 (Miss. 1967), in construing these very statutes, states quite clearly that the penalty imposed by statute against a foreign corporation doing business in this state without having first qualified therefor, is that it shall not be permitted to avail itself of the state courts *269 to enforce a cause of action accruing to it prior to the time it qualified to do business. Nothing is stated with reference to avoiding existing rights. By the provisions of the statutes and the authority cited it is our opinion that this contention of Walker is without merit.
As his second assignment of error this appellant asserts that the lower court erred in holding that the notes of Walker were not discharged by payment to Betty or, in the alternative, erred in holding that GSCC had a first lien thereon. The basis of this argument is quite similar to one of the contentions of Betty, that the payment of the assumed debts was a part of the immediate consideration for the sale of the property to Southern; that GSCC, as found by the court, was aware of these assumptions and nonpayment, and not having the status of an innocent purchaser, its lien was not superior, and in some fashion Betty thereby acquired the right to use the funds of his assignee in payment of the assumed debts. In support of this argument he also quotes from the case of Anaconda Aluminum Co. v. Sharp, 243 Miss. 9, 16, 136 So.2d 585, 587-588, 99 A.L.R.2d 1307 (1962) as follows:
It is a general rule "Where a fund has been set apart for the payment of an obligation or class of obligations, or a fund in the hands of a third person has been so designated as to require the latter to make payment out of it to a creditor, the general rule seems to be that the person for whose benefit the fund was so set apart or designated acquires a right to have it applied as directed, which right will be given a perference over the rights of other creditors in case of the debtor's insolvency; provided, of course, that no element of fraud or other superior equity enters into the transaction." 32 A.L.R. page 951.
Appellant then asks, by way of argument, "Is not the above quotation in essence what the chancellor stated in his findings: `[A]s in a construction loan simple justice required that they see to it that the money advanced be applied on the purchase price * * *.'" Our thought in regard to the quotation and query is that Anaconda, supra, does indicate that the person for whose benefit a fund has been set apart or designated acquires a right to have it applied as directed, and also this right will be given preference over the rights of other creditors, etc., but we do not think the right granted differs from any other legal right with regard to its enforcement; that is, the right granted would carry with it the privilege of enforcing the same, but only by legal processes and surely could not be construed to mean that the creditor, which Betty is not, could summarily divert the funds of another to release the assumed obligation.
Walker's payment of $37,448.87 to Betty at a time when he had both actual and constructive notice of the assignment is almost incredible and we can do nothing other than to affirm this point, as the law seems well settled in this state, as well as in others, that the attempted payment under these circumstances does not satisfy the debt. This rule is set forth in 70 C.J.S. Payment § 4b (1951) as follows:
In the absence of a statute to the contrary, a debtor cannot discharge his debt by making payment to one to whom his creditor is indebted unless his creditor consents thereto.
No suggestion is made that Southern consented to this payment. In fact, it had given actual notice to Walker of the assignment of the notes and had advised that it expected payment. In 40 Am.Jur. Payment section 30 (1942) it is stated:
If, after receiving notice of the assignment, the debtor pays the assignor, he will not be protected as against the assignee. * * *
In Ewin Engineering Corp. v. Deposit Guaranty Bank & Trust Co., 216 Miss. 410, 420, 62 So.2d 572, 576 (1953) we stated:
Where a person knows of an assignment and either incurs additional obligations *270 to the assignor or makes payment to him, or other persons, in preference thereto, he cannot escape liability to the assignee. Fennell v. McGowan, 58 Miss. 261; Illinois Central R. Co. v. Bryant, 70 Miss. 665, 12 So. 592; Wells v. Edwards House & City Railway Co., 96 Miss. 191, 50 So. 628, 27 L.R.A., N.S., 404; Fuller Const. Co. v. Allen Dredging Co., 162 Miss. 797, 140 So. 231.
See also Seymour v. Smith, 114 N.Y. 481, 21 N.E. 1042, 11 Am.St.R. 683 (1889). Alternatively, Walker contends that GSCC did not acquire a first lien upon the assigned notes for the reason that the assignment to it was conditional and the precedent conditions had not been met. Therefore, it is urged that the lien of GSCC on the assets of Southern did not extend to the notes as Southern was not in default thereon. This point has been decided to the contrary under a foregoing portion of this opinion under Betty's assignments. We again conclude it is without merit.
Walker's final assignment is that there was error on the part of the lower court in limiting Betty's first lien to the assumed loans and in subrogating Walker thereto, meaning, of course, that Betty should have a first lien on all of the assets of the defunct company. This point has been decided conversely under Betty's appeal and no good purpose would be served in repeating it.
Although it is regrettable that this appellant will have to pay additionally to satisfy his notes and deeds of trust, we are unaware of any method by which this Court can extricate him from his rashness in issuing his check in attempted payment of notes he knew to be assigned to another. We conclude that the points raised by Walker on his appeal are without merit.

THE APPEAL OF JOHN F. WOOD
John F. Wood, hereinafter referred to as Wood, was an intervening creditor and files this his separate appeal. His claim arises from work performed upon the refrigeration equipment of Southern. The debt due him is not, therefore, one of the debts assumed by Southern, but was incurred subsequent to the initial loan of GSCC which had been filed of record.
His first assignment is that the court found the corporation was organized and owned in fixed percentages with an agreement against dilution of the percentages; therefore, the court should have applied the theory of equitable subscription and held each of the stockholders liable for the amount of stock subscribed to, but remaining unpaid. Southern, a Delaware corporation, was organized with an authorized capital of $50,000. At the time of incorporation $2,000 in shares of stock were issued and divided in the proportions of: McCurley, 30%; Ann R. Smith, 30%; GSCC, 25%; and Albert Sidney Johnston, III, 15%. There is no doubt from the record that the stockholders had not obligated themselves to purchase any of the shares of stock authorized but unissued. They did agree that in the event of other stock being issued by Southern they would have the right to acquire such issue in the same percentages as the original issue, but there was no obligation, as we discern from the record, to purchase in this proportion. He cites in support of his argument a portion of Mississippi Code 1942 Annotated section 5309-51 (Supp. 1966) as follows:
A holder of or subscriber to shares of a corporation shall be under no obligation to the corporation or its creditors with respect to such shares other than the obligation to pay to the corporation the full consideration for which such shares were issued or to be issued. (Appellant's emphasis)
He then cites the case of Mulvihill v. Vicksburg Ry. Power & Mfg. Co., 88 Miss. 689, 706, 40 So. 647, 650 (1906), where the court stated:
In so far as complainant seeks to be declared a stockholder, entitled to a definite number of shares of the stock which has been issued, he misconceives *271 the true nature and extent of the relief to which he is entitled. The right of Mulvihill and associates was clearly not to receive a definite number of shares of stock, but an equitable right to the ownership of one-fourth of the whole railroad when completed and equipped, together with its franchises * * * The amount at which the capital stock was fixed was wholly immaterial as affecting this right. * * * (Appellant's emphasis)
He argues that the quoted provision of the statute, combined with the statement from Mulvihill, when considered with the undercapitalization and insolvency of Southern, constituted a legal fraud upon the creditors and therefore the theory of equitable subscription to all of the stock of Southern should be applied and the stockholders found to be indebted to Southern and its creditors in the sum of the amount of authorized but unissued stock, $48,000. The statute is contrary to appellant's position, as it provides that the subscriber to stock shall be under no obligation other than to pay the full consideration for shares issued or subscribed for. We do not construe this statute to obligate a stock purchaser to acquire the unissued but authorized stock of a corporation even though he has a preemptive right to do so. Mulvihill is not controlling authority for the proposition that the stockholders must purchase, as the case deals with the rights of shareholders to certain amounts of stock promised them by the corporation and not with a stockholder's obligation to purchase. Individually, the propositions propounded by Wood do not sustain his position. It is thus difficult to understand how collectively they would do so, as appellant argues, particularly in the absence of a finding by the trial court of insolvency and undercapitalization. We conclude this point is without merit.
Wood's second assignment is that Southern was grossly undercapitalized and insolvent from its creation and from the time of the purchase of the Betty property. This contention has no validity, as the chancellor found in response to a request by Wood that "* * * it was not insolvent on the day of incorporation." From the record this finding of the trial court does not appear to be unreasonable and we cannot say that it was manifestly wrong, as there is evidence to support it.
Appellant cites the case of Automotriz Del Golfo De California, etc. v. Resnick, 47 Cal.2d 792, 306 P.2d 1, 63 A.L.R.2d 1042 (1957) in support of his contention. This case holds that where individual stockholders deliberately set up the financial structure of a corporation in a manner which cannot function, for the purpose of escaping personal liability, they will be denied the separate entity privilege. That is, they will be denied the shelter of the corporate veil. This case is readily distinguished from the present situation as the chancellor here found no fraud and that Southern was organized according to the law. The stockholders were therefore not held to be individually liable. Again, in view of the evidence, this finding is not arbitrary or manifestly wrong, but rather is supported by the evidence as to all defendants. We conclude this contention is not well taken.
Wood next contends that the transfer by deed of trust of Southern's property for the benefit of GSCC, at a time when GSCC knew that Southern had insufficent assets for the purchase of the "Betty property" and which did leave the assumed debts unpaid, was an unconscionable attempt by GSCC to secure the indebtedness of Southern to itself to the exclusion of other creditors. He relies upon Smith v. Mississippi Livestock Producers Ass'n, 188 So.2d 758 (Miss. 1966); Frazier v. Zachariah, 174 Miss. 378, 164 So. 893 (1936); Kimbrough v. Davies, 104 Miss. 722, 61 So. 697 (1913); Lamb v. Russel, 81 Miss. 382, 32 So. 916 (1902); King v. Wooldridge, 78 Miss. 179, 28 So. 824 (1900); and Love Mfg. Co. v. Queen City Mfg. Co., 74 Miss. 290, 20 So. 146 (1896), as authorization for this argument. It is apparent from these cases that *272 there is no absolute rule which states that a stockholder cannot take a deed of trust from a corporation as security on property or assets transferred by him to the corporation. The absolute requirement is that one who does so has the burden of showing his good faith. Smith, supra, 188 So.2d at 764-765. As stated, the chancellor found from the evidence there was no fraud. We are of the opinion that appellant's argument in this regard is unavailing.
Wood next contends that the stock assigned by McCurley to GSCC as additional collateral should be considered an asset and property of Southern subject to the creditors' claims. There is no evidence that the transfer by McCurley of $15,000 worth of personal stock to GSCC in any way subjected this stock to the claims of creditors other than GSCC. The purpose of the transfer was to effectuate the purchase money loan as GSCC had "* * * declined to make said loan to Southern except upon the transfer to it as additional collateral and security of the stock certificates owned by McCurley. * * *" They were not the property of Southern, but were the personal assets of McCurley. Southern had no right to proceed against these assets or to use them in any manner while GSCC had the absolute right to proceed against them. "Upon default or breach of the aforesaid note or deed of trust or of any of the other documents executed in connection with said loan, and at the same time as when Gulf would, under the terms of such note, deed of trust, and other loan documents, have the right to foreclose or take other legal action, it shall have the same right to proceed against the stock certificates referred to herein the same, and to the same purposes, as if same were included in the deed of trust to Gulf." In brief, GSCC had the right by the terms of the agreement to proceed against these funds in the same manner as they could proceed against the assets of Southern in the event of default. Nowhere do we find evidence to the contrary. In fact, the agreement by GSCC to release this stock from the assignment in proportion to the repayment of the principal amount is indicative of its being pledged solely to GSCC. The appellant cites no authority to support his argument and we conclude it to be without merit.
The next specification of error is that GSCC was guilty of flagrant, willful and wanton mismanagement of Southern and is to be estopped from asserting any priority against other creditors. The cases of Stone v. Grenada Grocery Co., 190 Miss. 555, 1 So.2d 229 (1941); Weil Bros. v. Keenan, 180 Miss. 697, 178 So. 90 (1938); Railway Express Agency v. Bank of Philadelphia, 168 Miss. 279, 150 So. 525 (1933); Clark v. Dorsett, 157 Miss. 365, 128 So. 79 (1930); and Hall v. Box, 131 Miss. 218, 94 So. 221 (1922), stand for the general proposition that he who causes or assents to the injury of a third person must be the one who pays for such injury, as "where a mortgagee assists in or connives at the fraud whereby the mortgagor induces an innocent third person to buy the property, or lend money on it, as encumbered, such conduct will estop him to insist on the lien of his mortgage. * * *" 59 C.J.S. Mortgages § 285 (1949). We have no criticism of this statement as being perhaps a general statement of the law, but the argument fails for the reason there is no evidence of fraud on the part of GSCC, and in fact, the court found there was none. Likewise, the case of Raphael v. Alcott, 169 F. Supp. 691 (5th Cir.1958), which is cited in support of this proposition, is of no benefit to him as its facts indicate that the corporate officer was continuing a business for his personal profit and was issuing false statements as to the financial condition of the corporation. There is no evidence of similar actions by GSCC with regard to Southern. We are of the opinion that appellant's arguments are unavailing on these points.
Appellant again argues as his next assignment of error that GSCC acted in *273 bad faith throughout the whole course of the transactions and cannot now claim the benefits of its bad faith to the detriment of other creditors. This assignment is not well taken in view of the lower court's finding that there was no fraud and our own statements hereinabove made with regard thereto. Appellant also claims that under the Small Business Administration Regulations GSCC was forbidden to require the acquisition of stock as a condition of its loan to Southern. He quotes Section 107.601, Long Term Loans, as follows:
Each Licensee shall constitute also a source of funds for long-term loans for the sound financing of the operations, expansion and modernization of small business concerns. Such loans shall not provide any right in a Licensee to acquire any stock or other proprietary interest in the borrower, except through the medium of collateral security.
In response to this GSCC charges that the appellant does not call attention of the court to the provisions of Section 107.104, subparagraphs (c) (4) and (c) (6) which state:
(4) to provide equity capital to small business concerns (as defined by S.B.A.) under the conditions authorized by Section 304 of the Act and Regulations with the right to sell or dispose of securities so acquired in such manner and under such terms and conditions as the licensee shall determine;
and
(6) to acquire and make commitments for obligations and securities of a single enterprise only within the limitations established by Section 306 of the Act, unless such limitations are waived by S.B.A.;
Appellee contends that it furnished equity capital for Southern and was in compliance with the Small Business Administration rules and regulations. Neither of the contenders cites further authorities or regulations on the point and we do not feel constrained to make an independent research of the matter, it being, in our opinion, the appellant's duty to show by plausible argument with supporting authorities, in what way the lower court erred and upon its failure so to do, we can only conclude that the point is without merit.
Finally, Wood complains that the lower court erred in not allowing testimony as to losses occurring after the date on which the suit was filed. The contention of the appellee is that once the case was begun, jurisdiction was established and the matter was entirely in the discretion of the trial court. In Griffith, Mississippi Chancery Practice, sections 30 and 567, respectively (2d ed. 1950), it is stated: "* * * the court is limited by the pleadings  by the facts and issues as stated therein, and extends no further * * *" and "testimony on any issues not thus within the pleadings is irrelevant and incompetent. * * *" From this we conclude that evidence as to facts which occurred after the pleadings were filed were properly excluded by the chancellor. If the law were otherwise, the parties would never know "* * * what they will be required to meet or how to meet it." Griffith, Mississippi Chancery Practice, section 564 (2d ed. 1950). If the appellant had desired to offer evidence on the subsequent facts he could have amended his pleadings, by leave of court, after the defendant had answered. The chancellor then could have ruled upon the evidence and exercised his discretion therein, as by and large such matters are left to his discretion. In the absence of such motion we find no error on the part of the trial court in excluding this evidence.
Overall, we have considered the voluminous record in its entirety, the numerous briefs, and all assignments of error, and conclude that the decree of the trial court *274 should in all things be and it is hereby affirmed.
Affirmed.
ETHRIDGE, C.J., and RODGERS, SMITH, and ROBERTSON, JJ., concur.